# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

EDWARD J.X. FORD, JR.,                       :
                                   :
            Plaintiff,                       :
                                   :
           v.                       :          Civil Action No. 13-2054 (CKK)
                                   :
CHARLES MASSARONE, *et al.*,         :
                                   :
         Defendants.                   :

## MEMORANDUM OPINION

This matter is before the Court on Defendants Motion for Summary Judgment [ECF No. 48]. For the reasons discussed below, the motion will be granted.

## I. BACKGROUND

### A.  *Plaintiff's Criminal Convictions*

Plaintiff has been convicted of three murders, *see* Mem. of P. & A. in Support of Defs.' Mot. for Summ. J. [ECF No. 48] ("Defs.' Mem."), Decl. of JoAnn Kelley ("Kelley Decl.") ¶ 3, and has "been in continuous custody since May 23, 1980," Compl. [ECF No. 1] ¶ 48, the date on which he "pistol-whipped" a man "and then shot him to death," Movant's Mem. of Law with P. & A. in Support of Pl.'s Mot. in Opp'n to Defs.' Mot. to Dismiss [ECF No. 16] ("Pl.'s First Opp'n"), Ex. A (Notice of Action dated August 25, 2005). This "Federal conviction for First Degree Murder . . . entailed [plaintiff and his accomplices] unlawfully entering the Minimum Security Correctional Complex at Lorton, Virginia and murdering the victim, who was confined at the facility." Kelley Decl., Ex. C (Hearing Summary dated October 9, 2012) at 2. According to plaintiff, the victim twice had attempted to kill him, first by shooting him while he sat in his vehicle, and later by "throw[ing] several gasoline fire bombs against his door[] while firing

1

weapons to keep the [him] and his family trapped inside." Pl.'s Mot. in Opp'n to Defs.' Mot. to Dismiss and/or Summ. J. with Mem. of Law with P. & A. in Support [ECF No. 51] ("Pl.'s Second Opp'n") at 37; Compl. ¶ 63. He claimed to have killed the victim out of "[f]ear[] for his safety and the safety of his family[.]" Kelley Decl., Ex. C at 2. On September 15, 1980, the United States District Court for the Eastern District of Virginia imposed concurrent sentences of life imprisonment for first degree murder and fifteen years for conspiracy to commit first degree murder. Compl. ¶ 45; Kelley Decl., Ex. A (Sentence Monitoring Computation Data) at 1-2. The presumptive parole date on plaintiff's federal sentence was November 22, 2005. Kelley Decl., Ex. B at 1.

Plaintiff shot and killed his second victim in Northeast Washington on February 3, 1980. *See* Kelley Decl., Ex. B (DC Board of Parole Guideline Rehearing Assessment dated October 1, 2012) at 1. The victim allegedly "had raped and utterly terrorized [plaintiff's] aunt," who at that time "was dying from throat cancer[.]" Pl.'s Second Opp'n at 37; Compl. ¶ 63. An accomplice "met the victim . . . on the street [and] led him to [plaintiff's] car where he was forced to get into the car. The victim was shot in the head inside the car then pushed out of the car into an alley." Kelley Decl., Ex. B at 1. On June 4, 1982, the Superior Court of the District of Columbia imposed concurrent sentences of 20 years to life imprisonment for one count of first degree murder while armed, 10 years for kidnapping while armed, and an unspecified term for carrying a pistol without a license. *See* Compl. ¶ 47; Kelley Decl. ¶ 3. Plaintiff's D.C. sentence was to be served consecutively to the federal sentence, Pl.'s Second Opp'n, Ex. A (Memorandum to plaintiff from G.C. Nye, Inmate Systems Manager, dated May 15, 1990), and his aggregate minimum sentence was 20 years imprisonment, *id*., Ex. (Sentencing Monitoring Computation Data) at 3; *see* Compl. ¶ 46.

On February 26, 1980 in Prince George's County, Maryland, plaintiff reportedly shot and killed a friend.  Kelley Decl., Ex. B at 1.  Plaintiff "admitted that he was convicted of the offense [while denying that he actually had] commit[ed] the offense."  *Id.*, Ex. C at 2.  According to plaintiff, "he was implicated in the murder by . . . members of a rival drug gang[] in retaliation for his committing the murder on the Lorton Complex."  *Id.*, Ex. C at 2.  On June 18, 1981, "[h]e was sentenced . . . to a naturalized life term consecutive to any other sentence."  *Id.*, Ex. B at 1 (emphasis removed).  A detainer has been lodged.  *Id.* ¶ 3; *see id.*, Ex. A at 5.  If plaintiff were to be paroled from the D.C. sentence, he would be handed over to the Maryland authorities.  *See id.*, Ex. C at 3; Compl. ¶ 64 (remarking that parole on the D.C. sentence means "getting paroled to another life sentence, which awaits [plaintiff] in the State of Maryland").

In addition to these murder convictions, plaintiff's criminal history includes a robbery conviction in 1965 and a drug conviction in 1977.  Compl. ¶ 84.

### B. Parole Authority for D.C. Code Offenders

At all times relevant to the Complaint, the Superior Court imposed on an offender an indeterminate sentence "for a maximum period not exceeding the maximum fixed by law, and for a minimum period not exceeding one-third of the maximum sentence imposed."  D.C. Code § 24-403(a).  "[A]ny person so convicted and sentenced *may be released on parole . . . at any time after having served the minimum sentence*."  *Id.* (emphasis added).  Under District of Columbia law, parole may be granted when it appears that "there is a reasonable probability that a prisoner will live and remain at liberty without violating the law, that his . . . release is not incompatible with the welfare of society, and that he . . . has served the minimum sentence imposed or the prescribed portion of his . . . sentence, as the case may be[.]"  D.C. Code § 24-404(a) (formerly codified at D.C. Code § 24.204(a) (1989)).

When plaintiff committed the crimes for which he currently is imprisoned and when the Superior Court imposed his sentence, "authority for parole decisions for D.C. Code violations was vested in the District of Columbia Parole Board (the 'Parole Board')." Compl. ¶ 5.  The Parole Board was authorized to "[d]etermine if and when it is in the best interest of society and the offender to release him . . . on parole[.]"  D.C. Code § 24-401.02(a) (formerly codified at D.C. Code § 24-201.2 (1989)).   Consistent with the statute, the Parole Board's regulations provided:

> [T]he [Parole] Board shall be authorized to release a prisoner on parole *in its discretion* after he . . . has served the minimum term or terms of the sentence imposed or after he . . . has served one-third (1/3) of the term or terms for which he . . . was sentenced, as the case may be, if the following criteria are met:
>
> (a)     The prisoner has observed substantially the rules of the institution;
> (b)     There is a reasonable probability that the prisoner will live and remain at liberty without violating the law; and
> (c)     In the opinion of the [Parole] Board, the release is not incompatible with the welfare of society.

28 D.C.M.R. § 200.1 (emphasis added).[1]  "Once a prisoner became *eligible* for parole, the  . . . Parole Board would then determine whether he . . . was *suitable* for parole."  *Sellmon v. Reilly*, 551 F. Supp. 2d 66, 69 (D.D.C. 2008) (emphasis in original) (footnote omitted).

The Parole Board since has been abolished, *see* D.C. Code § 24-131(b), pursuant to the National Capital Revitalization and Self-Government Improvement Act of 1997, Pub. L. No.

---

[1]  Defendants have submitted copies of the following:

 (1) the Board of Parole's Policy Guidelines adopted by the Board in May 1987 (D.C. Municipal Regulations, Title 28, Corrections, Courts, and Criminal Justice); (2) the Board of Parole's Policy Guidelines ("Definitions of Terms Used in Parole Guidelines") adopted by the Board on December 16, 1991; (3) the Board of Parole's Policy Guidelines ("Reconsideration Hearings—Establishing Dates") adopted by the Board on April 27, 1992; and (4) the Board of Parole's Policy Guidelines ("Definitions of Terms Used in Parole Guidelines") adopted by the Board on October 23, 1995

Defs.' Mem., Decl. of Kate Dwyre ¶ 2.

105-33, § 11231(a)-(c), 111 Stat. 712, 745 (1997).  The Revitalization Act also transferred to the

United States Parole Commission ("Commission") the authority to grant, deny, impose or

modify conditions of, and revoke parole for District of Columbia Code felony offenders.  D.C.

Code § 24-131(a); *see Franklin v. District of Columbia*, 163 F. 3d 625, 632 (D.C. Cir. 1998)

(discussing transfer of parole authority).  For D.C. Code offenders such as plaintiff who found

themselves in federal custody prior to the Revitalization Act, "the Commission administered

their parole hearings, but in such circumstances, [it] was required to apply the Parole Board's

regulations, guidelines, policies, and practices[.]"  Compl. ¶ 12.

### C. Parole Regulations and Guidelines

#### 1. 1972 Guidelines

The Parole Board's early regulations, issued in 1972, "listed a set of factors that included,

'[a]mong others,' the nature of the prisoner's offense, his prior criminal history, his personal and

social history, and his institutional experience (including behavior in prison, involvement in

academic and vocational programs, etc.)."  *Daniel v. Fulwood*, 766 F.3d 57, 58-59 (D.C. Cir.

2014) (citing 9 D.C.R.R. § 105.1 (1972)).  They provided no "way to translate the factors into a

parole release date," however, *Phillips v. Fulwood*, 616 F.3d 577, 579 (D.C. Cir. 2010), and the

Parole Board then "operated with discretion that was 'almost unbridled,'" *Wilson v. Fullwood*,

772 F. Supp. 2d 246, 267 (D.D.C. 2011) (citing *Sellmon*, 551 F.Supp.2d at 86 n.15).

#### 2. 1987 Regulations

The Parole Board made its parole decisions for D.C. Code offenders using guidelines

"promulgated in 1985, *see* 32 D.C. Reg. 940 (Feb. 15, 1985)," which have become known "as

the 1987 [R]egulations because of their year of publication[.]"  *Phillips*, 616 F.3d at 580 n.2.  It

adopted "criteria consist[ing] of pre[-] and post-incarceration factors which enable[d it] to

exercise its discretion when, and only when, release is not incompatible with the safety of the community." 28 D.C.M.R. § 204.1.  Plaintiff has conceded "that the crimes for which he was tried, convicted, and sentence[d] did occur well-before the 1987 [Regulations] were enacted," Pl.'s Second Opp'n at 3, yet maintains that the 1987 Regulations apply to him, *see, e.g.,* Compl. ¶¶ 15-16.

First, the 1987 Regulations called for the calculation of a salient factor score ("SFS"), 28 D.C.M.R. § 204.2, described as "an actuarial parole prognosis aid to assess the degree of risk posed by a parolee," 28 D.C.M.R. § 204.3.  To calculate the SFS, the Parole Board considered six pre-incarceration factors: (1) prior convictions and adjudications (Item A); (2) prior commitments of more than 30 days (Item B); (3) age at the commission of current offense (Item C); (4) recent commitment-free period (Item D); (5) the offender's status (e.g., as a parolee or probationer) at time of current offense (Item E); and (6) a history of heroin or opiate dependence (Item F).  *See* 28 D.C.M.R. §§ 204.4-204.16.  Then it assigned a numerical value to each factor. *See* 28 D.C.M.R. § 201 app. 2-1 (SALIENT FACTOR SCORE).  With respect to the first factor, and with exceptions not relevant here, the Parole Board counted "[a]ll convictions . . . for criminal offenses . . . other than the current offense."  28 D.C.M.R. § 204.5(a).

"The SFS placed the candidate into one of four risk categories (10-9 = low risk, 8-6 = fair risk, 5-4 = moderate risk, or 3-0 = high risk) from which the Parole Board would determine a baseline number of points ('base point score') that provided 0 for low risk, 1 for fair risk, 2 for moderate risk, and 3 for high risk."  *Sellmon*, 551 F. Supp. 2d. at 70; *see* 28 D.C.M.R. § 204.17 & app. 2-1 (POINT ASSIGNMENT GRID ADULT OFFENDERS).  "The [Parole] Board would then take the base point score and adjust it using the remaining pre-incarceration factor and . . .

two-post incarceration factors to arrive at the Point Assignment Grid Score ('total point score')."
*Sellmon*, 551 F. Supp. 2d. at 70.

The remaining pre-incarceration factor assessed the type of risk the candidate posed. *Id.*;
*see* 28 D.C.M.R. § 204.18(a)-(g). If the candidate's current offense or a past convictions
involved a felony causing death or serious bodily injury, a felony in which the candidate used a
dangerous weapon, or a felony conviction for distribution or intent to distribute illegal drugs, the
Parole Board added one point (+1) to the candidate's base point score. *See* 28 D.C.M.R. § 204
app. 2-1 (TYPE OF RISK ASSESSMENT and POINT ASSIGNMENT GRID ADULT
OFFENDERS).

The post-incarceration factors were the candidate's institutional behavior and sustained
program achievement. *See* 28 D.C.M.R. § 204.18(h)-(i). The Parole Board could add one point
to a candidate's base point score (+1) if he committed serious disciplinary infractions, and it
could subtract one point from the candidate's base point score (-1) if the "offender demonstrated
sustained achievement in the area of prison programs, industries, or work assignments during
this period of incarceration." 28 D.C.M.R. § 204 app. 2-1 (Post-Incarceration Factors).

If the candidate's total point score was zero, one or two, the 1987 Regulations provided
that "[p]arole shall be granted at the initial hearing" with an appropriate level of supervision. 28
D.C.M.R. § 204.19(a)-(c). If the candidate's total point score was three, four or five, parole was
to be "denied at initial hearing and rehearing scheduled." 28 D.C.M.R. § 204.19(d). On
rehearing, the Parole Board took the candidate's "total point score from the initial hearing and
adjust[ed] that score according to the institutional record of the candidate since the last
hearing[.]" 28 D.C.M.R. § 204.21. If the candidate's score on rehearing was zero, one, two or
three, parole ordinarily would be granted at the appropriate level of supervision. 28 D.C.M.R. §

204.21(a); *see* 28 D.C.M.R. § 204 app. 2-2 (POINT GRID FOR PAROLE REHEARINGS).  If

the candidate's score was four or five, parole was "denied and a rehearing date scheduled."  28

D.C.M.R. § 204.21(b).

 The 1987 Regulations provided that the Parole Board could, "in unusual circumstances,

waive the SFS and the pre[-] and post-incarceration factors . . . to grant or deny parole to a parole

candidate."  28 D.C.M.R. § 204.22.  For example, if the candidate repeatedly had failed under

parole supervision, had a history of repetitive sophisticated criminal behavior, had an unusually

extensive and serious prior record, had displayed unusual cruelty to victims, or had "[r]epeated

or [e]xtremely [s]erious [n]egative [i]nstitutional [b]ehavior," the Parole Board could deny

parole.  28 D.C.M.R. § 204, app. 2-1 (DECISION WORKSHEET: INITIAL HEARINGS for

WORSE RISK).  If the candidate's criminal record resulted exclusively from trivial offenses or

if he showed exceptional achievement in educational or vocational programs while incarcerated,

the Parole Board could find him a better risk than application of the 1987 Regulations would

suggest and thus could have granted parole. 28 D.C.M.R. § 204, app. 2-1 (DECISION

WORKSHEET: INITIAL HEARINGS for BETTER RISK).  In these circumstances, the Parole

Board was required to "specify in writing those factors which it used to depart from the strict

application" of the 1987 Regulations.  28 D.C.M.R. § 204.22.

### 3. 1991 Policy Guideline

 In 1991, the Parole Board "adopted a policy guideline ('1991 Policy Guideline') to define

the terms used in the appendices" to the 1987 Regulations.  *Sellmon*, 551 F. Supp. 2d at 71.  The

1991 Policy Guideline defined "negative institutional behavior" to exclude consideration of an

infraction (other than murder, manslaughter, kidnapping, armed robbery, or first degree burglary)

occurring more than three years before the initial parole hearing.  *Id*.  The term "sustained

program or work assignment achievement" meant the "successful completion of one or more

educational or vocational programs, or program levels, each of which enabled the [candidate] to

develop an academic or job-related skill, OR enabled the offender to progress to a higher level of

difficulty or skill in the program area." *Id*.  On rehearing, such accomplishments were

"ordinarily . . . considered as sustained program or work assignment achievement where

completion occurred since the preceding consideration for release on the sentence."  1991 Policy

Guideline sec. VI-A-2(b).

The 1991 Policy Guideline also describes an unusually extensive or serious prior record

as a record of at least five felony convictions for the commission or attempted commission of

any one or any combination of specified crimes of violence:

> a. Arson;
> b. Assault, OR maliciously disfiguring another person, OR mayhem,
> OR manslaughter, OR murder;
> c. Forcible sodomy, OR sodomy of a child less than 16 years of age,
> OR rape;
> d. Kidnapping;
> e. Riot;
> f. Robbery;
> g. Unlawful use of explosives.

1991 Policy Guideline sec. VI-C-5.

### 4. 2000 Guidelines

"Similar to the 1987 Regulations, the [Commission's] 2000 Guidelines use a point score

system to determine whether a candidate is presumptively suitable for parole," *Sellmon*, 551 F.

Supp. 2d at 73, beginning with a Salient Factor Score ("SFS") to "assist the Commission in

assessing the probability that [a candidate] will live and remain at liberty without violating the

law."  28 C.F.R. § 2.80(c).  The Salient Factor Scoring Manual, *see* 28 C.F.R. § 2.20, directs that

the Commission consider and score the following: prior adult or juvenile convictions (Item A),

prior adult or juvenile commitments of more than 30 days (Item B), age when the current offense was committed (Item C), period of time the candidate has been commitment-free (Item D), the candidate's status as a parole or probation violator at the time of the current offense (Item E), and whether the candidate was 41 years of age or older at the time of the current offense (Item F). *See* 28 C.F.R. § 2.20.  Together with the SFS, the Commission considers and scores the type of risk the candidate poses – his SFS (Category I), his history of violence (Category II) and the death of or harm to a victim resulting from the candidate's behavior (Category III) – in order to calculate the candidate's base point score.  28 C.F.R. § 2.80(f).  The base point score is converted to a base guideline range, that is, a number of months "added to the [offender's] minimum sentence imposed by the court," *Sellmon*, 551 F. Supp. 2d at 73 (citing 28 C.F.R. § 2.80(h)), to "[d]etermine the total number of months until parole eligibility," 28 C.F.R. § 2.80(i).

After the Commission has added the base guideline range to the parole eligibility period, it makes adjustments for disciplinary infractions and program achievement.  *See* 28 C.F.R. § 2.80(j)-(k).   If the candidate has committed "any significant disciplinary infractions since the beginning of confinement on the current offense in the case of an initial hearing," the Commission determines the applicable guideline range under 28 C.F.R. § 2.36 for those infractions.  28 C.F.R. § 2.80(j).  If the Commission finds that the candidate has accomplished "superior program achievement," it awards the candidate "one-third of the number of months during which the prisoner demonstrated superior program achievement."  28 C.F.R. § 2.80(k). Whether a candidate has demonstrated "superior program achievement" is the subjective determination of the hearing examiner and Commissioners.  *Sellmon*, 551 F. Supp. 2d at 88; *see* Compl. ¶ 38.  After these adjustments, the Commission determines the total guideline range.  28 C.F.R. § 2.80 (*l*).

To determine the minimum guideline range, the Commission adds (1) the minimum of the base point guideline range, (2) the number of months required by the parole eligibility date, and (3) the minimum guideline range for disciplinary infractions, and from this number it subtracts the award of superior program achievement.  28 C.F.R. § 2.80(*l*)(1).  To determine the maximum total guideline range, the Commission adds (1) the number of months required by the parole eligibility date and (2) the maximum guideline range for disciplinary infractions, and from this total it subtracts the award for superior program achievement, if any.  28 C.F.R. § 2.80(*l*)(2).

In "unusual circumstances," the Commission "may . . . grant or deny parole to a [candidate] notwithstanding the guidelines."  28 C.F.R. § 2.80(n)(1).  Factors suggesting a decision above the guidelines include the unusually persistent failure under parole supervision, an unusually persistent history of criminally related substance abuse, an unusually persistent prior criminal record, extraordinary criminal sophistication in the current offense, unusual cruelty to a victim, or an unusual propensity to inflict violence.  *See* 28 C.F.R. § 2.80(n)(2).  A candidate may be a better risk than indicated by his SFS if, for example, his prior criminal record results extensively from minor offenses or if he has spent a significant crime-free period of time in the community.  *See id.*[2]

---

[2]  The 2000 Guidelines were published in the Code of Federal Regulations, *see generally* 28 C.F.R. §§ 2.70, *et seq.*, and initially applied to all D.C. Code offenders who became eligible for parole on or after August 5, 1998, *see Bailey v. Fulwood*, 793 F.3d 127, 130 (D.C. Cir. 2015), *pet. for cert. docketed*, No. 15-1217 (U.S. Mar. 29, 2016).  The District of Columbia Circuit "recognized that the 1987 [Regulations] and the 2000 Guidelines were 'substantially different,'" and "warned that retroactive application of the 2000 [G]uidelines could give rise to a violation of the *Ex Post Facto* Clause."  *Bailey*, 793 F.3d at 130 (citing *Fletcher v. Reilly (Fletcher III)*, 433 F.3d 867, 877-79 (D.C. Cir. 2006)).  Consequently, the Commission "promulgated a new rule . . . to address retroactive applications of the 2000 Guidelines," *id.* (citing 28 C.F.R. § 2.80(*o*)), such that it applies the 1987 Regulations to a D.C. Code offender who committed his offense between March 4, 1985, and August 4, 1998, *see generally* 74 Fed. Reg. 5854001 (Nov. 13, 2009).  A subsequent amendment to 28 C.F.R. § 2.80, effective October 19, 2015, provided that the Commission "apply the parole guidelines of the former [Parole Board] that were in effect until March 4, 1985 in its parole decisionmaking for D.C. Code prisoners who committed their offenses while those guidelines were in effect."  80 Fed. Reg. 63115 (Oct. 19, 2015).  In other words, the Commission would apply the 1972 Guidelines to D.C. Code offenders who committed their offenses on or before March 3, 1985.  Defs.' SOMF ¶ 30.  However, "[p]risoners who have previously been considered for parole under the 1987 [Regulations] . . . will

11

*C. Plaintiff's Parole Hearings*

1.  Initial Hearing on the Federal Sentence

"Plaintiff, because he was serving both a federal sentence and a D.C. Code [sentence],

was subject to 28 C.F.R. § 2.65 ('Paroling policy for prisoners serving aggregate U.S. and D.C.

Code sentences')."  Defs.' Statement of Material Facts As To Which There Is No Genuine Issue

("Defs.' SOMF") ¶ 16.  The Commission first would consider the federal offense "pursuant to

the guidelines at [28 C.F.R.] § 2.20, and . . . determine the appropriate number of months to be

served (the prisoner's 'federal time')."  28 C.F.R. § 2.65(c); *see* Defs.' SOMF ¶ 17.  Federal time

commenced "with the prisoner's initial commitment on the current aggregate sentence[.]"  28

C.F.R. § 2.65(c).  Next, after the Commission determined the parole eligibility date for the

federal sentence, it would "schedule a D.C. parole hearing to be conducted not later than four

months prior to the parole eligibility date, or the expiration of the 'federal time,' whichever is

later."  28 C.F.R. § 2.65(e); *see* Defs.' SOMF ¶ 17.

Plaintiff's initial parole hearing took place in October 2001.  *See* Kelley Decl., Ex. B at 1;

Reply Mem. in Support of Defs.' Mot. for Summ. J. [ECF No. 53] ("Reply"), Decl. of Kate

Dwyre ("Dwyre II Decl."), Ex. A (DC Board of Parole Rehearing Guidelines Prehearing

Assessment dated February 16, 2016) at 2.  Plaintiff's "two Murder convictions and sentences

were de-aggregated, with only the federal sentence considered at that time."  Kelley Decl., Ex. B

at 1.  As of October 30, 2001, plaintiff had "been in federal confinement . . . for a total of 258

months[.]"  Pl.'s First Opp'n, Ex. A (Notice of Action dated May 14, 2002).  Although the

guidelines "indicate[d] a range of 180+ months to be served before release for cases with good

---

continue to receive consideration under those guidelines."  28 C.F.R. § 2.80(p)(7).  This amendment does not apply
to plaintiff because the Commission already had considered his parole request under the 1987 Regulations.

institutional adjustment and program achievement," the Commission found that a "decision exceeding the lower limit of the applicable guideline category by more than 48 months [was] warranted" on the ground that plaintiff was "a more serious risk than indicated by [his] salient factor score in that [he] and [his] co-defendants committed [a] heinous act of murder in a prison setting," and plaintiff had "two other convictions for murder."  *Id.*, Ex. A.  The Commission set November 22, 2005 as plaintiff's presumptive parole date on the federal sentence "after service of 306 months."  Kelley Decl., Ex. B at 1; Compl. ¶ 46.  Ultimately, plaintiff was paroled from the federal sentence to commence service of the D.C. sentence on August 24, 2005.  Kelley Decl., Ex. C at 2.

### 2.  Initial Hearing on the D.C. Sentence

According to plaintiff, he "became eligible for parole on [the] D.C. sentence no later than May 28, 2000."  Compl. ¶ 48; *see id.* ¶¶ 72, 77; *see also* Pl.'s Second Opp'n, Ex. B (Memorandum to plaintiff from A.R. Steward dated September 20, 1995).  By the time the Commission conducted an initial parole hearing on August 10, 2005, Kelley Decl. ¶ 4, plaintiff claimed to have "served the 'minimum sentence and beyond' for his offenses," meaning that he had been incarcerated for "the period that an [offender] needed to serve to satisfy [his] accountability for the sentence itself," Compl. ¶ 51.

According to defendants, as stated above, only after service of federal time could the Commission address parole on the D.C. sentence.  And because plaintiff then was in federal custody while serving an aggregate federal and D.C. sentence, the regulations set forth in 28 U.S.C. § 2.65 applied to his case.  Defs.' SOMF ¶ 16.  These regulations, in turn, called for the application of "the point score system of the D.C. Board of Parole . . . to determine the prisoner's suitability for release on parole."  28 C.F.R. § 2.65(e).  Thus, defendants applied the 1987

Regulations at plaintiff's 2005 initial parole hearing on the D.C. sentence.  *See* Pl.'s First Opp'n,

Ex. A.  In addition, the Commission was "to presume that the eligible prisoner has satisfied basic

accountability for the D.C. Code offense behavior."  28 C.F.R. § 2.65(f).  Nevertheless, the

Commission "retain[ed] the authority to consider any unusual offense circumstances pursuant to

28 DCMR 204.22 to deny parole despite a favorable point score, and to set a rehearing date

beyond the ordinary schedule."  *Id*.

Under the 1987 Regulations, plaintiff's Salient Factor Score was 3, and with adjustments

for program achievement (-1), degree of risk (+1) and negative institutional behavior (+1),

Compl. ¶ 53, his total point score was 4.   According to plaintiff, no points should have been

assessed for negative institutional behavior because the underlying incident "did not rise to the

severity level required by the 1987 [Regulations] to be counted as negative institutional

behavior; and . . . the incident . . . occurred over seven (7) years prior to this initial parole

hearing."  *Id*.; *see id*. ¶ 72.[3] "Had the Commission actually evaluated [him] under the [1987

Regulations], his SFS . . . would have been 3 and with the reduction of -1 for his sustained

program achievement [his total point score would have been] only 2 points."  *Id*. ¶ 72 (emphasis

removed).  With a total point score of 2, and absent unusual circumstances to justify a departure

from the regulations, plaintiff asserted that he should have been paroled in 2005.  *See id*. ¶¶ 73-

75.

The Commission denied parole, and explained its rationale as follows:

> Under the guidelines for D.C. Code offenders, your current Grid
> Score includes [+]1 point for negative institutional behavior and
> includes -1 point for ordinary program achievement.

---

[3]  Plaintiff does not identify which gave rise to the adjustment for negative institutional behavior on initial parole consideration.  He states that he "has had only six . . . misconduct reports written against him which therein alleged nine . . . minor violations."  Pl.'s Second Opp'n at 22.  In his view, "none of them arose to the level called for to be counted[] as negative conduct under [the] parole guidelines."  *Id*.

> With adjustments reflecting your institutional record your current Grid Score is 4. *You continue to be scored under the 1987 guidelines of the D.C. Board of Parole. Those guidelines indicate that parole should not be granted at this time.* After consideration of all factors and information presented, a departure from the guidelines at this consideration is not warranted.
>
> After consideration of all factors and information presented, a departure above the rehearing guidelines at this consideration is warranted because you are a *more serious risk than indicated by your Grid Score* of 4. You committed your instant offense on February 3, 1980 when you kidnapped and murdered the victim. Less than 3 weeks later, you murdered a victim in Maryland. Then on May 23, 1980, you and your codefendants entered the Minimum Security Facility at the Lorton Reformatory and you pistol-whipped the victim and then shot him to death. *The risk of your homicidal behavior as reflected in you committing 3 murders in less than three months[] poses to the community is not adequately captured in your Grid Score.*

Pl.'s First Opp'n, Ex. A (Notice of Action dated August 24, 2005) (emphasis added). The matter was set for rehearing five years later. *See id.*

### 3. 2010 Rehearing on the D.C. Sentence

A rehearing took place on September 29, 2010. Kelley Decl. ¶ 4. According to plaintiff, his total point score on rehearing should have been 1 point, had the Commission calculated his total point score correctly as 2 points on initial hearing and adjusted his score (-1) for sustained program achievement. Compl. ¶ 76. Instead, defendants took the total point score of 4 points from the initial hearing and deducted one point for program achievement, "which gave [him] a total point score of 3 (by their [alleged] miscount)." *Id.* ¶ 80. Although a point score of 3 on rehearing indicated that parole ordinarily would be granted, the Commission denied parole and departed from the rehearing guidelines on the ground that "there was a reasonable probability that [plaintiff] would not obey the law if released and his release would endanger the public safety." Kelley Decl., Ex. B at 2. The Commission explained:

Your Grid Score at your last hearing was 4 point(s) . . . .

Under the guidelines for D.C. Code offenders, your current Grid Score includes -1 point for ordinary program achievement since your last hearing.

With adjustments reflecting your institutional record since your last hearing, your current Grid Score is 3. *You continue to be scored under the 1987 guidelines of the D.C. Board of Parole*. Those guidelines indicate that parole should be granted at this time. However, *a departure from the guidelines* at this consideration is found to be warranted because the Commission finds *there is a reasonable probability that you would not obey the law if released and your release would endanger the public safety.* You are a *more serious parole risk than shown by your point score* because your history includes Housebreaking (1958) and Robbery (1965). Additionally, you have committed a total of three violent crimes (three (3) separate murders) and despite your clear institutional conduct, your history indicates that you are a continued risk to the community.

Pl.'s First Opp'n, Ex. A (Notice of Action dated November 22, 2010) (emphasis added).

Plaintiff was to serve an additional 24 months in custody before a rehearing in October 2012. *Id.*

### 4. 2012 Rehearing on the D.C. Sentence

JoAnn Kelley, a hearing examiner, Kelley Decl. ¶ 2, conducted plaintiff's second

rehearing on October 9, 2012, *id.* ¶ 5. She described the proceedings as follows:

. . . At the hearing, I considered [plaintiff's] statements regarding his DC Code offense and [I] explained to him that he was a more serious risk that what the guidelines suggest based on his instant offense being the third occasion he has been convicted of murder. I considered [plaintiff's] statements regarding his two additional convictions and questioned him regarding a recent disciplinary infraction incurred on November 24, 2010. I also took into account his program achievements and release plan.

I calculated [plaintiff's] Grid Score as 2 under the 1987 [G]uidelines of the former D.C. Board of Parole. As stated in my Hearing Summary, [plaintiff's] prior Grid Score was 3 and he received -1 for program participation, resulting in a current Grid Score of 2. Because the 1987 [Regulations] indicate that parole

should be granted, I recommend [that he] be granted parole to his
consecutive life sentence.

*Id*. ¶¶ 5-6 (internal citations omitted); *see id*., Ex. C at 3 (recommending "[p]arole effective July

10, 2013, after service of 398 months, to the detaining authorities").  Plaintiff, too, believed that

parole was warranted at this time.  Compl. ¶ 82.

The Commission disagreed, however, and denied parole for the following reasons:

> With adjustments reflecting your institutional record since your last
> hearing, your current Grid Score is 2.  *You continue to be scored
> under the 1987 guidelines of the D.C. Board of Parole*.  Those
> guidelines indicate that parole should be granted at this time.  After
> consideration of all factors and information presented, *a departure
> from the guidelines* at this consideration is warranted because the
> following circumstances are present:  The Commission finds there
> is a *reasonable probability that you would not obey the law if
> released and your release would endanger the public safety*.  Your
> risk includes *three violent crimes resulting in loss of life to three
> individuals* . . . .
>
> The guidelines for the time to rehearing indicate that your next
> hearing should be scheduled within 12 months.  A departure from
> these guidelines is found warranted for the same reasons stated
> above for denying parole.

Kelley Decl., Ex. D (Notice of Action dated November 19, 2012) (emphasis added).  It set

plaintiff's parole rehearing for after the service of 36 additional months.  *Id*., Ex. D.

Although plaintiff was to have had a rehearing in October 2015, the hearing did not take

place on time because his case file had been transferred to "the Commission's Office of General

Counsel due to this pending litigation," and the Commission "neglected to request the file in time

so that [the matter] could be placed on the October 2015 docket."  Defs.' Mem., Decl. of Kate

Dwyre ¶ 3.  The matter was reset for the week of February 22, 2016 when the Commission

conducted hearings at FCC Coleman, the institution where plaintiff is designated.  Dwyer II

Decl. ¶ 4.

5. 2016 Rehearing on the D.C. Sentence

In anticipation of the third parole rehearing, "[o]n February 16, 2016, the Commission conducted a prehearing assessment" summarized as follows:

> [Plaintiff's] previous Grid Score was a 2 under the [1987 Regulations]. Since [plaintiff] last appeared before the Commission . . . , he completed several prison programs, industries, or work assignments. For that reason, the prehearing reviewer awarded him with -1 program achievement points, bringing his current Grid Score to 1. Although the applicable guideline indicated that parole should be granted at the rehearing with the highest level of supervision required, the prehearing review found factors countervailing the guideline to grant parole. More specifically, [plaintiff] has an extensive violent criminal history, which includes three separate convictions for murder.

Dwyre II Decl. ¶ 4; *see generally id*., Ex. A.

The rehearing took place on February 23, 2016. *Id*. ¶ 5. "Although the hearing examiner concurred with the guideline that was estimated in the Prehearing Assessment, [he] recommended a decision above the guideline after finding that there is a reasonable probability that [plaintiff] would not obey the law if released and that his release would endanger public safety." *Id*. Specifically, the hearing examiner noted plaintiff's "repetitive criminal behavior" and concluded that plaintiff "should serve an additional three years before a new hearing to determine parole suitability." *Id*., Ex. B (Post-Hearing Assessment) at 2. The hearing examiner drafted an order, approved by his supervisor and two Commissioners, denying parole and continuing the matter for a rehearing in February 2019. *Id*. ¶ 6; *see id*., Ex. C (Order). The Commission concurred:

> You have a grid score of 1 *under the 1987 [Regulations] for D.C. Code offenders*. The guidelines indicate that parole should be granted at this time. However, *a departure from the guidelines* at this consideration is found warranted because the Commission finds

> *there is a reasonable probability that you would not obey the law if released and your release would endanger the public safety.* You are a *more serious parole risk than shown by your grid score* because you were involved in *three separate murders* in 1980 and one involved you going on Lorton Prison property and killing an inmate. The type of *repetitive criminal behavior* that you exhibited during these three murders indicates you remain a *high risk to the community.*
>
> After consideration of all factors and information presented, a departure above the rehearing guidelines at this consideration is warranted for the same reasons provided above for denying parole.

*Id.*, Ex. D (Notice of Action dated March 7, 2015) (emphasis added).  Parole was denied, and

plaintiff's rehearing is set for February 2019 after service of 36 additional months.  *Id.*, Ex. D.

### D.  Plaintiff's Constitutional Claims

Plaintiff brings this action under 42 U.S.C. § 1983 against the Commission's former

Chairman (Isaac Fulwood), three current Commissioners (Charles Masserone, Patricia Cushwa,

and Patricia Wilson-Smoot), and one former Commissioner (Cranston J. Mitchell).  *See* Compl.

at 1. He "seek[s] to vindicate rights protected by the Ex Post Facto Clause of Article 1, Section 9

of the United States Constitution, the Fifth and Fourteenth Amendments of the United States

Constitution and federal law."  Compl. ¶ 1.  He demands that defendants "apply the Parole

Board's . . . guidelines . . . to [his] request for parole" and that defendants "reconsider the

decisions [previously] rendered on [his] applications for parole based on the existing record in a

manner consistent with the D.C. Parole Board's 1987 Regulations, 1991 Policy Guideline, other

statutes, regulations[,] guidelines, policies and practices of the Parole Board, federal regulations,

the Constitution and all other requirements of law[.]"  *Id.* at 21.

## II. DISCUSSION

### A. *Summary Judgment Standard*

The Court grants summary judgment if the moving party "shows that there is no genuine dispute as to any material fact and [he is] entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  To this end, defendants as the moving parties asserting that a fact cannot be genuinely disputed must support their assertion by "citing to particular parts of materials in the record, including depositions, documents . . . or declarations, stipulations . . . , admissions, [or] interrogatory answers[, or by] showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P.  56(c)(1); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  Plaintiff as the opposing party cannot rely on "mere allegations or denials" in response to defendants' showing. *Burke v. Gould*, 286 F.3d 513, 517 (D.C. Cir. 2002) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)) (internal quotation marks omitted).  He, too, must refer to particular materials in the record either to support his own assertions of fact or to oppose defendants' assertions. *See* Fed. R. Civ. P. 56(c)(1).  "If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may . . . consider the fact undisputed for purposes of the motion[.]" Fed. R. Civ. P. 56(e).  "[C]onclusory allegations unsupported by factual data will not create a triable issue of fact." *Exxon Corp. v. FTC*, 663 F.2d 120, 127 (D.C. Cir. 1980) (citing *Marks v. U.S. Dep't of Justice*, 578 F.2d 261, 263 (9th Cir. 1978)).

### B. *Ex Post Facto Claim*

The United States Constitution prohibits any State from passing an "ex post facto Law." U.S. Const. art. 1, § 9, cl.3.  The clause "is aimed at laws that 'retroactively alter the definition of

crimes or increase the punishment for criminal acts.'" *Cal. Dep't of Corr. v. Morales*, 514 U.S. 499, 504 (1995) (quoting *Collins v. Youngblood*, 497 U.S. 31, 43 (1990)). "Retroactive changes in laws governing parole of prisoners, in some instances, may be violative of this precept," *Garner v. Jones*, 529 U.S. 244, 250 (2000), where, for example, the law as applied to a particular prisoner's sentence "created a significant risk of increasing . . . punishment," *id.* at 255.

Plaintiff initially claimed that defendants retroactively applied the Commission's 2000 Guidelines "resulting in a significant risk of prolonging [his] sentence beyond what would have resulted under the guidelines in effect when [he] was convicted," and thus violating the ex post facto clause. Compl. ¶ 98; *see id*. ¶¶ 48, 50. Based on the Court's review of the record, however, the 2000 Guidelines never have been applied to plaintiff's case. Rather, each Notice of Action states that the Commission applied the 1987 Regulations, not only on initial consideration in 2005 but also on rehearing in 2010, 2012 and 2016. Therefore, the Court must reject any argument that defendants violated the ex post facto clause by the application of the 2000 Guidelines. *See Shakir v. Fulwood*, 108 F. Supp. 3d 1, 4 (D.D.C. 2015) (finding that that Notice of Action expressly stating that plaintiff had been "scored under the 1987 guidelines of the D.C. Board of Parole . . . would appear to dispose of the question" of which guidelines the Commission applied); *Wellington v. Fulwood*, No. 12-0209, 2013 WL 140254, at *3 (D.D.C. Jan. 11, 2013) (concluding that "[p]laintiff's *ex post facto* claim fails because it is based on the erroneous premise that the Commission applied its 2000 guidelines in his parole proceedings," and each Notice of Action shows that it "considered plaintiff's parole suitability under the point scale system set forth in the 1987 guidelines applicable to D.C. Code offenders").

Instead, plaintiff challenges the Commission's parole decisions which he claims were based on both "the 2000 Guidelines and [defendants'] own interpretation of the . . . 1987

[Regulations] and 1991 Policy Guideline[.]" Compl. ¶ 100. According to plaintiff, defendants applied an "apparent mixture" of guidelines, *id*. ¶ 78, so as to "significantly increase[] the risk that [his] period of incarceration [would] be prolonged and that [he] will serve longer than [he] would had the Parole Board's guidelines, policies, and practices been applied," *id*. ¶ 100; *see* Pl.'s Second Opp'n at 3, 32 (discussing supposed "philosophical differences between the two regmens [sic]"). Defendants allegedly ignore the fact that plaintiff "satisfied the accountability for his offense when he served his 'minimum sentence", i.e., when he was eligible for parole," Compl. ¶ 71, and as a result they in effect "re-sentenced [him to] a term of Life without the possibility of parole," *id*. ¶ 65. He appears to argue that defendants have accomplished this goal in three ways: by delaying his initial parole hearing on the D.C. sentence for five years beyond his parole eligibility date, by considering all three murder convictions when they should have considered only the D.C. murder conviction, and by placing more emphasis on pre-conviction conduct than on post-conviction conduct.

Plaintiff claims to have become eligible for parole in May 2000, after he "had served the full twenty years that the [sentencing] judge . . . established as the baseline for his sentence." Compl. ¶ 72. The 20-year minimum sentence "satisfied the accountability for his offense," *id*. ¶ 71, and by refusing to grant parole, plaintiff contends that defendants are "contravening the intent of the sentencing [j]udge." *Id*. ¶ 65. It appears that plaintiff equates parole eligibility with parole suitability, and these are two separate determinations:

> To clarify, eligibility is established by the sentencing court and defines the limits of the inmates' possibility of parole. Suitability is a decision made by the parole authority as to whether an inmate who is eligible, or has come up for parole review, is suitable for parole. Eligibility is determined according to statute and suitability is determined primarily either by guidelines or regulations promulgated by the paroling authority pursuant to statute.

*Sellmon*, 551 F. Supp. 2d at 69 n.4 (quoting *Cosgrove v. Thornburgh*, 703 F. Supp. 995, 997

(D.D.C. 1998)) (brackets and internal quotation marks omitted).

Furthermore, plaintiff's parole eligibility on the D.C. sentence cannot be considered in

isolation.  In May 2000, when plaintiff ordinarily would have been eligible for parole on the D.C.

sentence, he was serving federal time still.  "Due regard for the federal scheme precludes

[application of] the D.C. regulations to the D.C. portion of a mixed sentence while the prisoner

has yet to serve out the federal portion."  *Thomas v. Brennan*, 961 F.2d 612, 618 (7th Cir. 1992).

Where, as here, plaintiff's federal time extended beyond his initial parole eligibility date on the

D.C. sentence, "the need to accommodate the D.C. and federal parole regimes dictates that a

prisoner serving a mixed sentence is not necessarily entitled to application of the D.C. parole

guidelines upon completing the D.C. minimum term."  *Id*. at 619.  Accordingly, under 28 C.F.R.

§ 2.65(e), the Commission calculated plaintiff's parole eligibility on the federal sentence,

November 22, 2005, and only at that point did the Commission determine when to consider

parole eligibility on the D.C. sentence.  And consistent with 28 C.F.R. § 2.65(e), the Commission

conducted an initial parole hearing on the D.C. sentence in August 2005, roughly four months

prior to his parole date on the federal sentence.

Plaintiff next challenges defendants' "continued . . . use [of] the number of multiple

separate offenses in making their . . . parole decisions[.]"  Compl. ¶ 55; *see id*. ¶ 79.  In

plaintiff's view, there is a "vast and noticeable difference between the Parole Board and the

Commission" in that the Parole Board "place[d] more emphasis on Post-Conviction Conduct

(efforts toward rehabilitation) while the Commission places all of its emphasis on Pre-Conviction

Conduct (the nature of the crime, criminal history, etc.)."  *Id*. ¶ 61; *see id*. ¶¶ 72, 78.  Thus, it

relies on "these rather permanent variables (his three convictions for Murder) that will 'never'

change or disappear [w]hile not once giving any [credit or] credence to [his] genuine and sincere efforts at rehabilitation." *Id.* ¶ 56. Plaintiff fails to notice that "the factors set forth in the 1987 Regulations and the definitions articulated in the 1991 Policy Guideline never constrained the discretion of the [Parole] Board or the [Commission]." *Bailey v. Fulwood*, 793 F.3d 127, 132 (D.C. Cir. 2015), *pet. for cert. docketed*, No. 15-1217 (U.S. Mar. 29, 2016). Nothing in the 1987 Regulations prevents the Commission from considering plaintiff's criminal history, and that history includes three murder convictions. Neither the Parole Board nor the Commission is obliged to "render a decision based on a strict application of the system set forth in the 1987 Regulations." *Id.* (citing *McRae v. Hyman*, 667 A.2d 1356 (D.C. 1995)). The Commission need only comply with the governing statute by determining whether plaintiff can "live and remain at liberty without violating the law such that release would be compatible with the welfare of society." *Id.* (citing *McRae*, 667 A.2d at 1361); *see* D.C. Code § 24-404(a).

On initial consideration of plaintiff's parole request, the Commission adhered to the 1987 Regulations and found that, with a total point score of 4, parole would not be granted. Its upward departure from the regulations with respect to the additional time plaintiff was to serve before rehearing was based on its assessment of the risk plaintiff poses to society. *See* Pl.'s First Opp'n, Ex. A (Notice of Action dated August 24, 2005) ("The risk of [plaintiff's] homicidal behavior as reflected in [his having] committing 3 murders in less than three months[] poses to the community is not adequately captured in [his] Grid Score"). Similarly, although plaintiff's grid scores on rehearing indicated that parole ordinarily would have been granted, the Commission concluded each time that there remains a reasonable probability that plaintiff would not obey the law if released and that his release would endanger the public safety. *See, e.g.,* Kelley Decl., Ex. D ("Your risk includes three violent crimes resulting in loss of life to three

24

individuals . . . .   The behavior you have shown poses a risk to the community."); Dwyre II

Decl., Ex. A ("The type of repetitive criminal behavior . . . exhibited during . . . three murders

indicates that [plaintiff] remain[s] a high risk to the community.").   Denial of parole because

plaintiff posed a more serious risk than his grid scores indicate is permissible under the 1987

Regulations.  *See Phillips*, 793 F.3d at 582; *Wellington*, 2013 WL 140254, at *3.

Plaintiff suggests that the Commission improperly considered his three murder

convictions both to calculate his salient factor score and to justify an upward departure from the

regulations.  *See* Compl. ¶¶ 53, 86; Pl.'s Second Opp'n at 23-24.  Such "[d]ouble counting

occurs when the Commission uses the same criteria to establish both the parole guidelines and to

justify a departure from those guidelines."  *Kingsbury v. Fulwood*, 902 F. Supp. 2d 51, 59

(D.D.C. 2012) (quoting *Delong v. Snyder*, No. 5:07–HC–2195, 2008 WL 4510583, at *6

(E.D.N.C. Sept. 29, 2008)).  There is no dispute that plaintiff's criminal history is reflected in his

salient factor score, but the salient factor score reflects only the *number* of prior convictions.

The exercise of discretion to depart from the 1987 Regulations comes about on consideration of

the *nature* of plaintiff's prior convictions.  Here, plaintiff has caused the death of three victims,

and reliance on this information is permissible, and is not double counting, when the information

is used to make two distinct determinations.  *Kingsbury*, 902 F. Supp. 2d at 60; *see Maddox v.

U.S. Parole Comm'n*, 821 F.3d 997, 1001 (5th Cir. 1987).

In short, even if the Commission's interpretation of the 1987 Regulations is more strict

than the Parole Board's interpretation would have been, there "is not an *ex post facto* violation,

as long as the [Commission] acts within its discretion."  *Gambrell v. Fulwood*, 950 F. Supp. 2d

109, 124 (D.D.C. 2013), *aff'd*, 612 F. App'x 3 (D.C. Cir. 2015).

### C.  Due Process Claim

According to plaintiff, defendants denied his right to due process in two ways.  First, defendants allegedly "follow improper self-imposed standards, rather than the guidelines established by the Parole Board," Compl. ¶ 106, and even when they purported to follow the Parole Board's guidelines, defendants still "fail[ed] to follow the very guidelines they are purporting to apply," *id.* ¶ 107.  The Court readily disposes of this first claim.  Defendants demonstrate, and plaintiff does not show otherwise, that the Commission applied the 1987 Regulations at each turn.  Second, plaintiff alleges that defendants refused to award proper credit for "program and work achievement."  Compl. ¶ 105.  This claim, too, is without merit.  Review of each Commission decision reveals that plaintiff's total point score has been adjusted (-1) for program achievement on initial consideration and at each rehearing.

Elsewhere, plaintiff claims to have been deprived of due process when defendants denied parole even after acknowledging that his total point scores on rehearing indicate that parole should be granted.  *See* Pl.'s Second Opp'n at 40.  Plaintiff proceeds as if he is entitled to parole, yet "parole is never '*required* after the [Parole] Board determines that the necessary prerequisites exist.'"  *Ellis v. District of Columbia*, 84 F.3d 1413, 1420 (D.C. Cir. 1996) (quoting *Bd. of Pardons v. Allen*, 482 U.S. 369, 376 (1987)) (emphasis in original); *Price v. Barry*, 53 F.3d 369, 370 (D.C. Cir. 1995) (stating that the D.C. Code "provides no substantive limitations on the Board's authority to grant parole which would create a liberty interest"); *McRae*, 667 A.2d at 1361 (concluding that the 1987 Regulations do not give rise to a liberty interest in parole); *see also Greenholtz v. Inmates of Nebraska Penal & Correctional Complex*, 442 U.S. 1, 7 (1979) ("There is no constitutional or inherent right of a convicted person to be conditionally released before the expiration of a valid sentence.").

To the extent that plaintiff deems the Commission's decisions arbitrary and capricious, this claim is without merit.  "While the D.C. Circuit has not explained what constitutes arbitrary governmental conduct specifically in the context of parole release decisions, the D.C. Circuit declared, in the context of parole revocation, that the Commission's decision must not be either totally lacking in evidentiary support or [ ] so irrational as to be fundamentally unfair." *Gambrell*, 950 F. Supp. 2d at 117 (internal quotation marks and citations omitted).   Here, the Commission bases its decisions on the undisputed fact of plaintiff's three murder convictions, violent offenses occurring within a three-month period.  It cannot be said that the upward departures lack evidentiary support or are so arbitrary as to deny plaintiff due process.

### III. CONCLUSION

For the reasons discussed herein, the Court will grant defendants' motion for summary judgment.  An Order is issued separately.


DATE: September 13, 2016                    /s/
                                            COLLEEN KOLLAR KOTELLY
                                            United States District Court Judge